STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF CARVER                      FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| My Pillow, Inc.; Michael J. Lindell; Mike Lindell Products LLC; Lindell Media LLC; Lindell Technologies, LLC; Lindell Properties, LLC; Lindell Publishing, LLC; Lindell Services, LLC; Lindell Management, LLC; Prior Lake 40 Acres, LLC; and Lindell-TV LLC, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 10-cv-24-1166 |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | **SUMMONS - LIFETIME FUNDING, LLC, FUNDERZGROUP, LLC, MICHAEL KANDKHOROV, MICHAEL KAND, ABE KAND** |
| Lifetime Funding, LLC; FunderZgroup, LLC; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapSpot Financial; and John and Jane Does, | §<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§<br>§ | Jury Requested |

_____

TO:   DEFENDANTS LIFETIME FUNDING, LLC, FUNDERZGROUP, LLC, MICHAEL KANDKHOROV, MICHAEL KAND, ABE KAND, AND THEIR COUNSEL RICHARD R. VOELBEL, 220 SOUTH 6TH STREET, SUITE 2200, MINNEAPOLIS MN 55402

1.     **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.     **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called <u>service</u>.You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.



ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category.  The instructions will explain in detail how to fill out the *Answer* form.

3.    **You must respond to each claim.**  The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.    SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*.

To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

> Barbara Podlucky Berens, #209788
> Kari Berman, #256705
> Berens & Miller, PA
> 3720 IDS Center
> 80 South Eighth Street
> Minneapolis, MN 554025

Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.    **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7.    **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

STATE OF MINNESOTA                    DISTRICT COURT

COUNTY OF CARVER                    FIRST JUDICIAL DISTRICT

_____



| | | |
|---|---|---|
| My Pillow, Inc.; Michael J. Lindell; Mike Lindell Products LLC; Lindell Media LLC; Lindell Technologies, LLC; Lindell Properties, LLC; Lindell Publishing, LLC; Lindell Services, LLC; Lindell Management, LLC; Prior Lake 40 Acres, LLC; and Lindell-TV LLC, | § § § § § § § § | Civil Action No. _____ |
| Plaintiffs, | § § § | |
| v. | § § | COMPLAINT |
| Lifetime Funding, LLC; FunderZgroup, LLC; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapSpot Financial; and John and Jane Does, | § § § § § § | Jury |
| Defendants. | § § | |

_____

## **INTRODUCTION**

This is an action for violations of the Racketeer Influenced and Corruption

Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO") brought by Plaintiffs My Pillow,

Inc. ("My Pillow"), Michael J. Lindell ("Lindell"), as well as Mike Lindell Products

LLC; Lindell Media LLC; Lindell Technologies, LLC; Lindell Properties, LLC; Lindell

Publishing, LLC; Lindell Services, LLC; Lindell Management, LLC; Prior Lake 40

Acres, LLC; and Lindell-TV LLC (collectively the "Lindell Entities), against Defendant

Lifetime Funding, an alleged merchant cash advance company (hereinafter "Lifetime" or

Filed in District Court
State of Minnesota
10/25/2024 7:46 PM

"the MCA"); Michael Kand, Abe Kand, and Tiffany Johnson ("Johnson"), all of whom are associated with Lifetime; FunderZgroup, LLC, an entity allegedly involved and being paid by Lifetime to manage ACH withdrawals, reporting, and deal tracking ("FunderZ"), but in reality just another merchant cash advance company in cahoots with Lifetime; Michael Kandkhorov, who is associated with FunderZ (but who may also be associated with Lifetime); Sam Hernandez, who introduced Lindell to Lifetime and brokered the transaction at issue; CapSpot Financial ("CapSpot"), an entity affiliated with Hernandez; Alan Hernandez, the chief operating officer of CapSpot who was also involved in inducing the transaction at issue; and John and Jane Doe Investors, Members, Owners, and/or Funding Partners in Lifetime (and all of the Defendants together are "the Enterprise" under RICO law).

This RICO action is based on alleged an "Merchant Agreement" dated September 19, 2024 (the "MCA Agreement") pursuant to which Lifetime purportedly paid funds to allegedly purchase My Pillow's future receivables at a discount and My Pillow agreed to repay the face value of its receipts through daily payments.

While couched as the purchase of future receivables, the MCA Agreement's terms and conditions, as well as the Defendants' actions since that time, demonstrate that despite the disclaimers in the MCA Agreement and the guaranties, no sale of receipts ever took place, and the form MCA Agreement is merely a sham intended to evade the applicable usury laws.

Lifetime has no risk in the transaction because My Pillow, as the borrower, always remained liable for the debt and My Pillow and/or Lindell and the Lindell Entities (as the purported guarantors) bore the risk of non-payment of any receivables and remained on the hook for the entire amount at issue. As a result, the MCA never made a bona fide purchase of My Pillow's receivables under the MCA Agreement and the transaction is, in reality, a usurious loan.

Specifically, My Pillow borrowed (and Lindell and the Lindell Entities allegedly guaranteed) a total of $600,000.00, which required daily payments of $16,800.00, which yields the total amount to be repaid as $840,000.00. Not only that, but Lifetime also took an additional $36,035.00 upfront in so-called "fees," which represented an even greater amount of hidden interest, which resulted in My Pillow receiving a net total of $563,965.00. Given those sums, My Pillow has been charged an interest rate of **368%** (or **441%** if the $36,035.00 Lifetime charged in "fees" is also included), which is many times greater than the maximum interest rate permitted under the applicable state usury law (that is, New York), as well as the fraudulent 5.65%, which was labeled as the "SPECIFIED PERCENTAGE" in the MCA Agreement, and thus this transaction is an illegal, usurious loan.

Plaintiffs also entered into the transaction as the result of a classic bait and switch. Hernandez, who brokered the deal, represented that to get the other loan on the real estate, Plaintiffs had to enter into an MCA transaction with Lifetime so that Lifetime would also make a real estate loan on two properties in Minnesota. Once Lifetime loaned the funds,

3

it refused to make the real estate loan that was Plaintiffs' reason and consideration for entering into the MCA transaction with Lifetime.

In addition, Lifetime required the involvement of FunderZ, another MCA company, to purportedly assist and track the deal. There may, however, be an overlap in personnel between Lifetime and FunderZ.

Plaintiffs have now learned that the arrangement with Lifetime was made based on Defendants' concerted misconduct and fraudulent statements, including the bait and switch, that the entire nature of the transaction was misrepresented, that the loan was usurious, unconscionable, and thus unenforceable, and that the Defendants' coordinated misconduct violates RICO.

It is against this backdrop that Plaintiffs file this Complaint.

## **PARTIES**

1.     Plaintiff My Pillow is a Minnesota corporation with its principal place of business in Chaska, Minnesota.

2.     Plaintiff Lindell is a Texas citizen and the founder of My Pillow.

3.     Plaintiff Mike Lindell Products LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

4.     Plaintiff Lindell Media LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

5.     Plaintiff Lindell Technologies, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

4

Filed in District Court
State of Minnesota
10/25/2024 7:46 PM

6.      Plaintiff Lindell Properties, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

7.      Plaintiff Lindell Publishing, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

8.      Lindell Services, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

9.      Lindell Management, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

10.     Prior Lake 40 Acres, LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

11.     Lindell-TV LLC is a Minnesota limited liability company with its principal place of business located in Minnesota.

12.     Defendant Lifetime is a  merchant cash advance company which may be located in Florida and that extends usurious loans, masked as "purchases" of businesses' accounts receivable, in flagrant violation of the applicable state usury laws.   Upon information and belief, Lifetime is located at 20200 West Dixie Hwy. #1205, Aventura, FL  33180.

13.     Defendant Michael Kand is associated with Lifetime.   His address is unknown.

14.     Defendant Abe Kand is associated with Lifetime.  His address is unknown.

15.     Defendant Johnson is a Lifetime portfolio manager.  Her address is unknown.

16.     Defendant FunderZ is another MCA that was to be paid fees under the MCA

Agreement.

17.     Defendant Michael Kandkhorov (who may also be known as Michael Kand)

is associated with FunderZ and is, upon information and belief, an officer of FunderZ.  His

address is unknown.

18.     Defendant Sam Hernandez brokered the usurious loan transaction and

guaranties.  His address is unknown.

19.     Defendant CapSpot is, upon information and belief, the broker entity

Hernandez is associated with.

20.     Defendant Alan Hernandez is also affiliated with CapSpot and was also

involved in the brokering of the usurious loan transaction and guaranties.  His address is

unknown.

21.     John and Jane Does Investors, Investors, Members, Owners, and/or Funding

Partners (hereinafter the "Investors") are persons or entities currently unknown to Plaintiffs

that own, participate in, and/or provided funds to Lifetime, and Plaintiffs have thus sued

said Defendants using fictitious names.

## VENUE AND JURISDICTION

23.     Venue is appropriate in this county pursuant to Minn. Stat. § 542.09 because

Defendants engaged in fraud and other intentional misconduct, which was purposefully

aimed at My Pillow, a Minnesota corporation located in Carver County, and the purported

guarantors, which are all but Lindell citizens of Minnesota that are located in Carver

County.  As a result, the bulk of the resulting injury being felt by Plaintiffs in Carver County, Minnesota.

24.    In addition, many of the actions at issue occurred in or were directed to Carver County, the unconscionable and fraudulent MCA Agreement and purported guaranties at issue were executed by Lindell in Carver County, and the choice of venue clauses (for venue in New York) should be void as an overreaching, unconscionable, and unenforceable provisions of the two agreements at issue.

25.    There personal jurisdiction over the Defendants because they: (a) purposefully directed activities and consummated the MCA Agreement with a Minnesota corporation; (b) the claims arise from Defendants' forum-related activities in making and attempting to collect on a usurious loan; (c) upon information and belief, Defendants solicit and/or engage in business in Minnesota; (d) Defendants conspired to engage in unlawful activity in Minnesota; and (e) exercise of jurisdiction comports with due process notions of fair play and substantial justice.

26.    This Court has personal jurisdiction over Lifetime because it engaged in negotiations with and entered into the MCA Agreement with My Pillow, a Minnesota corporation and Lindell signed the MCA Agreement on behalf of My Pillow in Minnesota. The Lindell Entities, which purportedly guaranteed the loan, are all incorporated in Minnesota and their principal places of business are all in Minnesota, and Lindell signed their purported guaranties in Minnesota.

7

27.    In addition, Lifetime, Michael Kand, Abe Kand, and Johnson engaged in an unlawful conspiracy both inside and outside Minnesota which had the effect of harming the Plaintiffs, all but one Minnesota citizens, in Minnesota and as a result, the harm caused in Minnesota was foreseeable.

28.    The Court has personal jurisdiction over the remaining Defendants because they engaged in the unlawful conspiracy with Lifetime outside Minnesota but which had the effects of harming the Plaintiffs, all but one Minnesota residents, in Minnesota and as a result, the harm in Minnesota was foreseeable.

29.    In addition, Hernandez, as acting the broker on behalf of Capspot, communicated with Lindell in Minnesota on many occasions when brokering this transaction and the agreements at issue.

30.    Lifetime's Michael Kand also communicated with Lindell in Minnesota a number of times when entering into the transaction and agreements at issue.

31.    FunderZ, another MCA company, was also to be paid by My Pillow, a Minnesota corporation, to purportedly assist and track the deal, in furtherance of the misconduct at issue here.

32.    The amount at issue exceeds $50,000.00.

## BACKGROUND OF THE MCA INDUSTRY

### A.    The Predatory MCA Industry.

33.    The MCA industry specializes in providing struggling businesses with high-risk loans at exorbitant interest rates, disguising those loans as the alleged purchase of

future receivables. The MCA industry typically seeks to hide within the gray areas of the law, attempting to take advantage of procedural remedies and loopholes in distant state courts to disguise its predatory lending practices.

34.    The Federal Deposit Insurance Corporation ("FDIC") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced…; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting and unsophisticated borrower."[1]

35.    This is what the MCA companies do. Among other things, they generally require unaffordable daily payments that they know the debtor is unlikely to be able to repay given the extraordinary interests rates and fees the MCA companies demand. They further leverage various legal and contractual processes to guarantee full repayment, thus assuming virtually no risk in the transaction.

36.    In addition, MCA companies will immediately sue borrowers that are struggling to pay daily payments with the intent to obtain a default judgment, knowing that the borrowers are unlikely to be able to retain counsel because the borrowers are unable to afford to do so.

---

[1] *See* FDIC website, at https://www.fdic.gov/news/financial-institution-letters/2007/fil07006a.html.

37.     In other cases, MCA companies will initiate a lawsuit with the intent of gaining the leverage to force the borrower to enter into an onerous, unconscionable "settlement agreement," in which the debtor allegedly remains obligated to make all the remaining payments while purportedly waiving the right to prosecute a claim against the MCA lender.

38.     Thus, as Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]   The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[3] As one of these brokers admitted, the "industry is absolutely crazy.…   There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[4]

39.     The National Consumer Law Center has also recognized that the lending practices of MCAs are predatory because the transactions are underwritten based on the ability to collect rather than the ability of the borrower to repay without going out of business.

40.     One reason for this is that MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus]

---

[2]   Zeke Faux & Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG  (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[3]   *Id.*

[4]   *Id.*

may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. (noting that "a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

**B.**   **MCA Lenders Take a Number of Steps to Disguise Their Usurious Loans.**

41.   To facilitate their predatory conduct, MCA lenders make every effort to disguise their MCA agreements as the "purchase" of a business's future receivables or revenue streams (and the accompanying guaranties are similarly disguised) when the transactions evidenced by those MCA Agreements (and the guaranties) are in fact illegal, usurious loans.

42.   The MCA lenders use the false guise of their alleged purchase of receivables or future revenue streams to evade state usury laws.

43.   The MCA lenders also go out of their way to expressly (but falsely) assert in their MCA agreements that the transactions subject to the MCA agreements are not loans. Courts have nonetheless ruled that such express disclaimers (and other terms of the agreements) are not enough to transform these transactions from usurious loans to other, nonregulated arrangements. Nonetheless, as the case law develops, the MCA lenders continue to hide their true intent by going to additional, extraordinary lengths to alter the

language in their MCA agreements in an ongoing attempt to avoid state usury laws and case law.

44.     Despite the MCA lenders' ongoing evasive efforts, the true nature of these transactions remains the same. This industry is essentially loan sharking, and the so-called "merchants" and their guarantors remain the only parties that have actual risk in these transactions as the MCA lenders embed the agreements with a plethora of disclaimers, fraudulent statements, and unconscionable remedies, and employ other improper tactics and devices to ensure that they will be repaid at grossly inflated rates by hook or by crook.

45.     The MCA companies only care about whether they can collect upon default or nonpayment, and not whether the struggling businesses on which they prey are able to even survive.

46.     Here, although the MCA Agreement is titled a "Merchant Agreement," and purports to represent the sale and purchase of My Pillow's future receivables, the Enterprise markets, underwrites, and collects upon its transactions as loans, with interest rates far greater than those permissible under state usury law, here, New York.

### C.     MCA Agreements are Substantively and Procedurally Unconscionable.

47.     MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length (despite frequently including written disclaimers to the contrary). Instead, MCA companies target and prey on struggling businesses that are otherwise facing a cash crunch, the inability to pay their employees or purchase additional products, and possible closure.

48.    Further, these MCA Agreements contain a number of one-sided terms that prey upon the desperation of these businesses and their individual owners and are designed to conceal the fact that these transactions, including those involving the Plaintiffs here, are in reality usurious, illegal loans.

49.    Among the one-sided terms typically included in MCA Agreements are: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the borrower's bank accounts, including collecting checks and signing invoices in the borrower's name; (2) a provision preventing the borrower from transferring, moving, or selling its business or any of its assets without permission from the MCA company; (3) a one-sided attorneys' fees provision obligating the borrower to pay the MCA company's attorneys' fees but not the other way around; (4) a venue and choice-of-law provision which purports to require the borrower to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction; (5) absolute and unconditional business and personal guaranties of all of the borrower's obligations; (6) a jury trial waiver; (7) a class action waiver; (8) an agreement to provide a U.C.C. lien over the borrower's assets; and (9) a prohibition from obtaining financing from any other source.

50.    **All** of the foregoing terms were included in the MCA Agreement at issue here.

## FACTUAL BACKGROUND OF THIS DISPUTE

### A.    A Bait and Switch Fraudulently Induced the Lifetime Transaction.

51.    In September of 2024, My Pillow was in need of funding.  Hernandez was in communication with Lindell, who was seeking a real estate loan on two properties located

Filed in District Court
State of Minnesota
10/25/2024 7:46 PM

in Minnesota. Lindell disclosed that there were already liens on the two properties, which Hernandez said was not a problem. Hernandez claimed, however, that in order to obtain the real estate loan, My Pillow must enter into "the other one" first (that is, the loan with Lifetime).

52.    Lindell then spoke with Michael Kand from Lifetime, who agreed to provide $600,000.00 in funds with a daily payment of roughly $16,000.00.

53.    The next day, Michael Kand said he was still willing to fund My Pillow but that it would now require a daily payment of $24,000.00 (and not the roughly $16,000.00 daily payment Michael Kand agreed to the prior day) for the same $600,000.00 of funding.

54.    Lindell refused to agree to Michael Kand's unilateral and unexplained increase in the daily payment that was to be charged.

55.    Lifetime then agreed to provide funds with the original daily payment proposed.

56.    Hernandez also assured Lindell several times that Lifetime would provide the real estate loan within days after the MCA Agreement and guaranties were executed.

57.    After the execution of the documents at issue, Lifetime refused to honor its commitment to make the real estate loan.

**B.    There Was No Underwriting Process, Revealing that the Transaction is a Usurious Loan.**

58.    Neither Lifetime nor Hernandez engaged in any underwriting process as to the My Pillow's receivables before agreeing to provide funds, demonstrating that the transaction at issue is a loan, and not a purchase of My Pillow's future receivables.

59.    Indeed, Lifetime's website trumpets its improbably truncated "underwriting" process, proclaiming "*Instant Funding  Fast application.  Instant approval decision*."  *See* Lifetime website, at https://lifetimefundingllc.com (emphasis added).

60.    That statement in the website underscores Lifetime's failure to engage in any meaningful underwriting before making usurious loans and its lack of concern regarding whether a business is financially capable of repaying the loans made at such extraordinary interest rates and exorbitant additional fees being charged.

61.    Lifetime's website also emphasizes that it makes **loans** to businesses:

Why Us?

Lifetime Funding provides fast, unsecured, customized business loans up to $5,000,000 to clients in virtually all industries. We have years of combined experience.  *Our team helps businesses attain substantial amounts of working capital in as little as one business day*. Unlike traditional business loans, which can take weeks or months to finalize, our streamlined funding process affords our clients the agility they need to focus on growth in the present.

Lifetime website, at https://lifetimefundingllc.com (emphasis added).

62.    Lifetime's website further claims that the "Advantages to working with Lifetime Funding include a "95% Approval Rate" and "230% Increased Business Revenue."  *See* Lifetime website, at https://lifetimefundingllc.com.  The 95% approval rate touted by Lifetime further confirms that it does not conduct any meaningful due diligence, including on a business's receivables, before loaning funds at exorbitant rates.

**C.    Other Evidence Demonstrates that the Transaction Is a Usurious Loan.**

63.    Under the MCA Agreement, My Pillow borrowed (and Lindell and the Lindell Entities allegedly guaranteed) a total of $600,000.00, which required daily payments of $16,800.00, for a total to be repaid of $840,000.00.

64.    Lifetime also took an additional $36,035.00 in so-called "fees," representing an even greater amount of hidden interest, and thus only loaned a new amount of $563,965.00.  This transaction was usurious loan because My Pillow has been charged an interest rate of **368%** (or **441%** if the $36,035.00 in "fees" are included), which is many times greater than the maximum interest rate permitted under state usury law of New York.

65.    Thus, like many MCA companies, Lifetime and the Enterprise took advantage of My Pillow, a cash-strapped business that needed funds quickly and was relying on the representations that by executing the MCA Agreement and guaranties, My Pillow would also be provided with a real estate loan on the two properties.

66.    Lifetime has also filed a U.C.C. lien against My Pillow and Lindell, further demonstration that the transaction is a loan.

**D.    The MCA Agreement Is One-Sided and Unconscionable.**

67.    The MCA Agreement also includes a number of other, one-sided provisions: (1) a schedule setting forth a number of so-called fees that My Pillow was required to pay upon the occurrence of certain events, for example, a "stacking fee" if My Pillow obtained any other financing, a default fee, and a blocked account fee; (2) a prohibition against the diversion of any funds in any of My Pillow's bank accounts; (3) requiring My Pillow to

give Lifetime advance permission to contact any bank of My Pillow's to obtain any information Lifetime wanted; (4) granting Lifetime the right to enter My Pillow's business premises to check My Pillow's processing terminals to ensure My Pillow was not violating the MCA Agreement; (5) granting Lifetime access to all of My Pillow's employee records; (6) requiring My Pillow to provide information about its vendors and suppliers so that Lifetime could contact such parties at any time; and (7) requiring My Pillow to keep the MCA Agreement confidential.

68.    The guaranty is similarly unconscionable, for example, by requiring the guarantors to pay for any amount that Lifetime might be required to return in the event that either My Pillow and/or its guarantors are subject to a bankruptcy proceeding and requiring the guarantors to perform without first requiring Lifetime to provide them with notice of material changes, failures to perform, renewals or modifications to the MCA Agreement, and/or any other extension of additional funds to My Pillow.

69.    The MCA Agreement and guaranties are also unconscionable because they contain false statements, including (a) that transaction is not a loan and Lifetime is not a lender; (b) that there is no fixed repayment term; (c) that there was some undefined rate of 5.65% (which was labeled as the "SPECIFIED PERCENTAGE"); and (d) no interest was being charged.

70.    In addition, the MCA Agreement is unconscionable because it is designed so that the entire arrangement would inevitably fail and cause My Pillow to default. Among other things, the MCA Agreement is designed to result in a default in the event that My Pillow's business suffers any downturn in revenues by: (a) preventing My Pillow from

obtaining any other financing at all; and (b) requiring My Pillow to continuously represent and warrant that there have been no material adverse changes, financial or otherwise, in its condition, operation, or ownership.

71.     My Pillow, as borrower, and Lindell and the Lindell , as guarantors, thus fell victim to all of these and other predatory tactics when agreeing to the loan with the MCA.

**E.    Defendants Took Other Steps to Intentionally Disguise the True Nature of the Transaction.**

72.     Despite its disclaimers, the transaction between My Pillow and Lifetime is, in economic reality, a loan that is absolutely repayable.    Among other indicia that this transaction is really a loan are:

> (a)     The daily payments required by the MCA Agreement were fixed and the so-called reconciliation provision therein was a mere subterfuge to avoid the applicable usury laws and circumvent case law.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time and any request for reconciliation would not change the total amount owed;
>
> (b)     The default and remedy provisions purported to hold My Pillow absolutely liable for repayment of the purchased amount.   The MCA Agreement required My Pillow to ensure sufficient funds in the designated bank account to make the daily payments;
>
> (c)     While the MCA Agreement purported to "assign" all of My Pillow's future account receivables to the Enterprise until the purchased amount is paid, My Pillow retained all the indicia of and obligations related to the ownership of its account receivables, including the duty to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise acquired a security interest in My Pillow's accounts (and virtually all other assets) to secure payment of the loaned amount;
>
> (d)     Unlike true receivable purchase transactions, the MCA Agreement was entered into without any analysis of  My Pillow's past and/or future receivables;

18

(e)     The purchased amount was not calculated based upon the fair market value of My Pillow's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate they wanted to be paid.  Indeed, the Enterprise did not request any information concerning My Pillow's account debtors upon which to make a fair market determination of the value of the receivables;

(f)     Lifetime assumed no risk of loss which would have resulted from My Pillow's failure to generate sufficient receivables to cover the daily payments because the failure to maintain sufficient funds in the designated bank account constituted a breach (which would in turn trigger Lifetime's purported right to get paid all of the amount allegedly still owed);

(g)     Lifetime required that My Pillow undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring My Pillow would continue to operate and generate receivables and any breach of such obligations, representations, and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from My Pillow's failure to generate and collect receivables that were allegedly purchased.

(h)     Lifetime required that My Pillow grant it a security interest in virtually all assets and, further that Lindell and the Lindell Entities allegedly guarantee the performance of the representations, warranties and covenants, some of which Lifetime knew were in breach from the start. For example, there is a provision which stated that My Pillow's execution of the MCA Agreement would not cause or create a default in any other agreement, but Lifetime was aware that My Pillow was already a party to other loan agreements.

**F.     The MCA Agreement Transfers All Risk of Loss to Plaintiffs.**

73.     The MCA Agreement also contained numerous provisions which transferred any risk of loss away from Lifetime and solely onto the Plaintiffs.  Such provisions include: (a) a sham reconciliation provision; (b) a defined term; (c) the granting of an overly broad security interest; (d) a personal guaranty; (e) guaranties by a number of other entities; and (f) various other, general provisions that purport to grant Lifetime a number of one-sided

procedural and substantive rights to enforce the MCA Agreement, such as a prejudgment remedy waiver and an acceleration clause which purportedly required My Pillow to pay all of the remaining loan amount upon any event of default.

a.    Sham Reconciliation Provision

74.    The MCA Agreement contained a sham reconciliation provision to give the appearance that the loan does not have a definite term (one of the techniques MCAs use in an effort to avoid the prohibitions of state usury laws, here, New York).

75.    Under a legitimate reconciliation provision, if a borrower pays more through its fixed weekly payments than it actually received in receivables, the borrower is entitled to seek the repayment of any excess money paid to coincide with the receivables collected. Thus, if income decreases, so do the payments.  Here, however, the MCA Agreement provides that Lifetime still remains responsible for the entire amount at issue no matter what the outcome of any requested reconciliation.

76.    Upon information and belief, Lifetime does not even have a reconciliation department, and thus, the reconciliation provision is a meaningless.

b.    Ascertainable Fixed Term

77.    The MCA Agreement provides an ascertainable fixed term, since the daily payment is fixed as well as the total amount to be repaid (fraudulently labeled "Purchased Amount"), neither of which is subject to actual adjustment.  The fixed term can thus be quickly and easily determined by dividing the "Purchased Amount" by the daily payment amount, resulting in a term of fifty days.

c.    Taking an Inordinately Broad Security Interest

78.    The MCA Agreement purports to allow Lifetime to "purchase" a set sum of My Pillow's future receivables.

79.    However, rather than taking a security interest in future receivables, the security interest in the MCA Agreement is substantially broader than that, purportedly providing:

> [A] security interest in all of the Seller's rights, titles and interest in all accounts, including, but not limited to: deposit accounts, accounts receivables, other receivables, chattel paper, documents, equipment, general intangibles, instruments and inventory (collectively, the "Collateral"), whether now existing or hereinafter acquired.

80.    That security interest is further proof that the alleged "purchase" of My Pillow's receivables was nothing but a sham and that Lifetime had no risk under the transaction.

### d.    Guaranties by Lindell and the Lindell Entities

81.    Lifetime further ensured that it would bear no risk of loss by requiring Lindell to execute a personal guaranty as well as mandating guaranties from the Lindell entities.

82.    Those guaranties provided that "The Guarantor hereby irrevocably, absolutely and unconditionally guarantees to the Purchaser prompt, full, faithful and complete performance and observance of all of Seller's Obligations under the Agreement. The Guarantor unconditionally covenants to the Purchaser in the event of a default or breach at any time by the Seller, the Guarantor shall be responsible for the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to non-performance of the Obligations."

83.     Moreover, those guaranties allegedly include Lindell Recovery Network, a nonprofit company that neither My Pillow nor Lindell have any ownership interest in, further evidence of Defendants' improper overreaching in an effort to ensure they have no risk in the transaction.

84.     Plaintiffs recently learned that courts have ruled that MCA Agreements like this one are fraudulent and unconscionable contracts for illegal, usurious loans and that MCA companies that engage in this misconduct with others in an enterprise violate RICO when conducting their business.  As a result, Plaintiffs commenced this lawsuit.

### FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

85.     Plaintiffs repeat and reallege all of the paragraphs in the Complaint as though set forth here.

**A.     The Unlawful Activity.**

86.     There are two predicate acts underlying the First and Second Causes of Action in this Complaint.  First, the making of unlawful, usurious loans, and second, engaging in wire fraud.

87.     As set forth more fully above, despite the many false statements and contract terms allegedly to the contrary, the financial arrangement between Lifetime and My Pillow is a loan, and not a merchant cash advance.

88.     Here, the interest rate that My Pillow was paying on the Lifetime loan was at least **368%** (even more if the upfront fees are also included).

89.     The disclosures Defendants made about the loan are clearly fraudulent (for example, the MCA Agreement's representation that this arrangement is not a loan).  This loan violates state usury law, as set forth more fully herein.

**B.      Culpable Persons.**

90.     Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.  At all relevant times, each of FunderZ; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapSpot; and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

91.     Upon information and belief, Alan and Sam Hernandez, on behalf of CapSpot, brokered the usurious loan and guaranties and assisted in the perpetration of the bait and switch, and they were paid by Lifetime for their improper and illegal acts to facilitate the usurious loan.

92.     The John and Jane Doe Investors are individuals and business entities that provide funding for illegal and grossly usurious loans, including this one.

93.     Through their operation of and engagement with Lifetime, the foregoing Culpable Persons solicit, underwrite, fund, service, and  collect upon unlawful debt incurred by businesses like My Pillow.

### C.    The Enterprise.

94.    Defendants all constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

95.    Defendants are associated in fact and through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing, and collecting on usurious loans and charging exorbitant interest rates greatly in excess of the permitted interest rate under the applicable usury laws, here New York.

96.    Since at least 2023 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreement relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to struggling businesses throughout the United States.

97.    The debt evidenced by My Pillow's MCA Agreement constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c); 18 U.S.C. § 1962 (d); and 18 U.S.C. § 1961(6) because:  (a) it violates the applicable criminal usury statutes; and (b) the rates are more than many times more than the legal rate for interest permitted under the applicable usury law.

98.    Since at least 2023 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreement relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

24

10-CV-24-1166

CASE 0:24-cv-04535-JMB-TNL    Doc. 1-1    Filed 12/18/24    Page 27 of 36    Filed in District Court
State of Minnesota
10/25/2024 7:46 PM

99.    The Enterprise's misconduct also constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the Individual Companies Within the Enterprise.**

100.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    Lifetime.**

101.    Lifetime, upon information and belief, maintains officers, books, records, and bank accounts independent various other Defendants, including, the John and Jane Doe Investors.

102.    FunderZ; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapSpot Financial; and the John and Jane Doe Investors have operated, engaged and/or conspired with Lifetime as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.

103.    Pursuant to its membership in the Enterprise, the MCA has: (i) entered into contracts with brokers such as Sam Hernandez, Alan Hernandez, and CapSpot to solicit borrowers for the Enterprise's usurious loans and participation agreement with the John

and Jane Doe Investors to fund the usurious loans; (ii) pooled the funds of John and Jane Doe Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into so-called MCA agreements on behalf of the Enterprise to memorialize the usurious loans; (v) serviced the usurious loans; and (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debts.

104.    In this case, Lifetime, through FunderZ; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapSpot; and the John and Jane Doe Investors:  (i) solicited borrowers; (ii) collected and pooled funds from Investors to fund the MCA Agreement; (iii) decided to proceed with the MCA Agreement; (iv) entered into the MCA Agreement; (v) collected upon the unlawful debt evidenced by the MCA Agreement by effecting daily ACH withdrawals from My Pillow's bank accounts; and (vi) engaged in other collection activities on behalf of Lifetime.

### ii.    The Brokers.

105.    Alan and Sam Hernandez and CapSpot acted as brokers for the placement of the usurious loan and, upon information and belief, were paid to broker the illegal loan between Lifetime and My Pillow.  Among other things, Alan and Sam Hernandez and CapSpot:  (i) solicited and introduced My Pillow and Lindell to Lifetime; (ii) facilitated the usurious loan transaction; (iii) represented to Plaintiffs that Lifetime would also provide a real estate loan which was contingent on the MCA loan; and (iv) solicited and gathered information from Plaintiffs to assist in the completion of the usurious loan transaction.

### iii.    The Employees or Associates of Lifetime.

106.    Johnson is Lifetime's portfolio manager; Michael Kand and Abe Kind work with Lifetime and upon information and belief, Michael Kind is Lifetime's managing partner. These three individuals have also facilitated the usurious loan, the Enterprise, and for Johnson, improper collection efforts of the usurious loan.

### iv.    The John and Jane Doe Investors.

107.    The John and Jane Doe Investors are, upon information and belief, a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Lifetime.

108.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Lifetime with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreement with My Pillow, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreement and other financial arrangements with borrowers to collect upon the unlawful debts.

109.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of the collection of unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### v.    The John and Jane Doe Owner(s).

110.    Upon information and belief, the John and Jane Doe Owner(s) of Lifetime are the masterminds of the Enterprise. They are responsible for the day-to-day operations

of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

111. In their capacity as the mastermind of the Enterprise, the John and Jane Doe Owner(s) are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreement used by the Enterprise to attempt to disguise the unlawful loans as a receivable purchase agreement to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; and (ii) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect on the unlawful loans including, without limitation, loans extended to My Pillow.

112. The John and Jane Doe Owner(s) have also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

113. The John and Jane Doe Owner(s) ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Lifetime and to the John and Jane Doe Investors.

### E.    Interstate Commerce.

114.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

115.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Minnesota, including My Pillow and the Lindell entities, and throughout the United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

116.    In the present case, all communications between the members of the Enterprise and My Pillow were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.   Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advance under the Agreement, and collect the daily payments *via* interstate electronic ACH debits.

### F.    Injury and Causation.

117.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

118.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments.

Filed in District Court
State of Minnesota
10/25/2024 7:46 PM

119.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs  associated with exposing and prosecuting Defendants' criminal activities.

120.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

121.    Plaintiffs repeat and reallege all of the paragraphs in Complaint as though set forth herein.

122.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

123.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email and other communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loan, including the MCA Agreement, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

124.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful

debts, including the MCA Agreement, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the loan to My Pillow under the MCA Agreement.

125. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

126. The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

127. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

128. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

129. The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

130. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

131.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

132.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

133.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

134.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

135.     The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

136.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

137.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

138.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

139.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
### (Declaratory Judgment)

140.     Plaintiffs repeat and reallege all of the paragraphs in the Complaint as though fully set forth herein.

141.     An actual controversy exists regarding the unconscionability and unlawfulness of the MCA Agreement with Defendants.

142.     Plaintiffs are therefore seeking from the Court a declaration that for the reasons set forth herein, the MCA Agreement with Defendants is both unconscionable and unlawful, and therefore is void and unenforceable.

143.     Plaintiffs are also seeking a declaration that the MCA Agreement is a usurious loan in violation of the applicable state usury laws and is thus void and unenforceable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a)     Declaring that Plaintiffs' MCA Agreement with Defendants is unconscionable and unlawful, and therefore void and unenforceable;

b)     Declaring Plaintiffs' MCA Agreement with Defendants to be a usurious loan in violation of the laws of New York and thus void and unenforceable;

c)     That Defendants have violated 18 U.S.C. § 1962;

d)     Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial or by summary determination;

e)     Awarding treble damages;

f)   Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

g)   Any further relief deemed appropriate by the Court.

Dated:  October 25, 2024                    **BERENS & MILLER, P.A.**

                                            s/Barbara Podlucky Berens
                                            Barbara Podlucky Berens (#209788)
                                            Kari Berman (#0256705)
                                            80 South 8th Street
                                            3720 IDS Center
                                            Minneapolis, MN 55402
                                            (612) 349-6171
                                            bberens@berensmiller.com
                                            kberman@berensmiller.com

                                            *Attorneys for Plaintiffs*