**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| My Pillow, Inc.; Michael J. Lindell; Mike Lindell Products LLC; Lindell Media LLC; Lindell Technologies, LLC; Lindell Properties, LLC; Lindell Publishing, LLC; Lindell Services, LLC; Lindell Management, LLC; Prior Lake 40 Acres, LLC; and Lindell-TV LLC, | Civ No.: 0:24-cv-04535-JMB-TNL |
| Plaintiffs, | |
| v. | |
| Lifetime Funding, LLC; FunderZgroup, LLC; Michael Kandkhorov; Michael Kand; Abe Kand; Tiffany Johnson; Sam Hernandez; Alan Hernandez; CapShot Financial; and John and Jane Does, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Lifetime Funding, LLC ("Lifetime"), FunderZgroup, LLC ("FunderZgroup"), Michael Kandkhorov, Michael Kandhorov (a/k/a Michael Kand), and Abraham Kandhorov (a/k/a Abe Kand) (together, "Defendants") hereby submit this memorandum of law in support of their motion to dismiss the Complaint of Plaintiffs My Pillow, Inc. ("My Pillow"), Michael J. Lindell ("Lindell"), Mike Lindell Products LLC, Lindell Media LLC, Lindell Technologies, LLC, Lindell Properties, LLC, Lindell Publishing, LLC, Lindell Services, LLC, Lindell Management, LLC, Prior Lake 40 Acres, LLC, and Lindell-TV LLC and state as follows.

## INTRODUCTION

On September 19, 2024, Lifetime and My Pillow entered into a Future Receivables Sale and Purchase Agreement (the "Agreement"). Under the Agreement, Lifetime advanced My Pillow $563,965 in exchange for the right to collect a greater amount of My Pillow's future receivables. Ultimately, however, My Pillow remitted only $268,800 of its receivable before refusing to further perform. To date, therefore, My Pillow has ***gained*** $295,965 on the parties' transaction.

Apparently, this isn't enough. My Pillow has now filed this RICO action seeking to recover damages under the theory that the parties' transaction wasn't a bona fide purchase but, instead, a disguised, usurious loan. Putting aside the absurdity of a party who ***gained*** $295,965 claiming damages, Plaintiffs' RICO claim predicated on collection of unlawful debt fails. Under applicable law (Connecticut or Minnesota), the Agreement isn't a loan subject to usury laws and, even if it were, it's statutorily exempt from those laws. Indeed, even under New York law (which, for some reason, Plaintiffs claim to be applicable), the Agreement isn't usurious. Plaintiffs, therefore, can't establish the usury element of their RICO claim predicated on collection of unlawful debt and that claim fails. While Plaintiffs half-heartedly assert a RICO claim predicated on a pattern of

2

racketeering, there are no concrete allegations to support that claim and it too fails. Finally, Plaintiffs claim that the Agreement (under which they **gained** $295,965) is unconscionable. To succeed on this claim, Plaintiffs would have to establish that Lindell – a world-famous businessman who once had access to the Oval Office and the ear of the President of the United States – is on par with the commercially illiterate consumer that the doctrine of unconscionability was designed to protect. Respectfully, this is preposterous; Plaintiffs' unconscionability claim fails and Plaintiffs' Complaint should be dismissed with prejudice for failure to state a claim.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Parties.

My Pillow is a Minnesota corporation. Doc. No. 1-1, Compl. ¶ 1. Its principal place of business is in Minnesota. *Id*. The other nine corporate Plaintiffs are Minnesota limited liability companies. *Id*. ¶¶ 3-11. Their principal place of business is in Minnesota. *Id*. Lindell is My Pillow's founder and CEO. *See id*. ¶ 2.

Lifetime is a New York limited liability company engaged in the business of revenue-based financing. *See id*. at p. 2; *see also* Declaration of Richard R. Voelbel ("Voelbel Decl."), Ex. 1. Lifetime is authorized to do business in Connecticut. *Id*., Ex. 2. Michael Kandkhorov, Michael Kandhorov (a/k/a Michael Kand), and Abraham Kandhorov (a/k/a Abe Kand) are alleged to be associated with Lifetime. *See* Doc. No. 1-1, Compl. ¶¶ 13-14, 17.

FunderZgroup is a Florida limited liability company. *See* Voelbel Decl., Ex. 3. FunderZgroup is authorized to do business in Connecticut. *Id*., Ex. 4. Michael Kandkhorov is alleged to be associated with FunderZgroup. Doc. No. 1-1, Compl. ¶ 17.

## II.      The Agreement.

On September 19, 2024, Lifetime and My Pillow entered into the Agreement pursuant to which Lifetime purchased 5.65% of My Pillow's total future receipts up to the sum of $840,000 in exchange for a discounted upfront purchase price of $600,000.  *See* Declaration of Michael Kandhorov ("Kandhorov Decl."), Ex. A at p. 1.  The Agreement disclosed on the first page that $36,035 in fees would be deducted from the purchase price and, thus, that the net funding amount would be $563,965.  *Id*.  Lindell, on behalf of My Pillow, agreed to these terms.  *See id*.  Lindell signed his name twice (and his initials once) on the first page.  *See id*.  Lindell thereafter signed the Agreement in eleven different places and initialed every page.  *See id*.

Under the Agreement, My Pillow agreed to deliver the purchased amount of receipts to Lifetime through an initial daily remittance of $16,800, which, according to My Pillow, was a good faith approximation of 5.65% of its average daily receipts.  *See id*., Ex. A at p. 1, §§ I.n, XIII.d.

The daily remittance wasn't a fixed amount and could be adjusted based upon a change in My Pillow's revenue.  *See id*., Ex. A § 10.  To that end, the Agreement included a mandatory reconciliation provision pursuant to which the daily remittance could be adjusted on a going-forward basis to more closely reflect 5.65% of My Pillow's actual daily receipts.  *See id*.[1]

Pursuant to the foregoing – and specifically because the daily remittance was subject to regular adjustment – there was no fixed date by which My Pillow was obligated to deliver the purchased amount of receipts (if ever).  *See id*.  Indeed, the Agreement expressly states that "[t]his Agreement does not have a fixed duration" and that "[t]he period of time that it will take [Lifetime]

---

[1] Lifetime wasn't required to perform a reconciliation unless My Pillow made a written request and provided the necessary financial documents.  *See id*.  My Pillow doesn't allege that it ever did so.  *See* Doc. No. 1-1, Compl.

to collect the Purchased Amount [of receipts] is not fixed, is unknown to both Parties…and will depend on the success of the [My Pillow's] business. *Id.*, Ex. A §§ II, XIII.c

Lifetime agreed that My Pillow could be "excused from performing its obligations under the Agreement in the event [its] business ceases its operations exclusively due to….[a]dverse business conditions that occurred for reasons outside of [My Pillow's] control…[or] bankruptcy…." *Id.*, Ex. A §§ II, XIII.i.

The parties expressly acknowledged that the Agreement wasn't a loan and that there was no "interest":

> This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by [My Pillow] from [Lifetime]. [Lifetime] does not charge [My Pillow] and will not collect from [My Pillow] any interest on the monies used by [Lifetime] for the purchase of the Purchased Future Receipts.
>
> ***
>
> The Parties agree that the Purchase Price is paid to the [My Pillow] in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by the [Lifetime] is not intended to be, nor shall it be construed as a loan from the [Lifetime] to [My Pillow] that requires absolute and unconditional repayment on a specified maturity date. [Lifetime's] ability to receive the Purchased Amount is conditional upon the performance of [My Pillow's] business.

*Id.*, Ex. A § XIII.b.

The Agreement provided that it would be "governed by and construed in accordance with the laws of the State Connecticut." *Id.*, Ex. A § XX.i.

In an Addendum to the Agreement, the parties acknowledged that Lifetime was engaging FunderZgroup "to manage the ACH withdrawals, reporting and deal tracking." *Id.*, Ex. A at p. 21.

### III.    The Guaranty.

In connection with the Agreement, Lindell executed a Personal Guaranty of Performance (the "Guaranty") pursuant to which he guaranteed "the prompt and complete performance of all

obligations of [My Pillow]….”  *Id.*, Ex. A at p. 14.  Lindell’s obligations under the Guaranty were only triggered if My Pillow defaulted on the Agreement.  *See id.*

### IV.    Lifetime’s Performance and My Pillow’s Default.

On or about September 19, 2024, Lifetime advanced My Pillow the agreed upon net purchase price of $563,965.  *See* Doc. No. 1, Compl. ¶ 64.  After receiving the purchase price, My Pillow remitted only $268,800 of its receipts.  *See* Kandhorov Decl., Ex. B.  On October 22, 2024, Lifetime sued My Pillow for breach of the Agreement.  *See* Voelbel Decl., Ex. 5.  To date, My Pillow has ***gained*** $295,965 on the parties’ transaction ($563,965 − $268,800 = $295,965).  *See* Doc. No. 1, Compl. ¶ 64; Kandhorov Decl., Ex. B.

### V.    Procedural History.

On November 27, 2024, Plaintiffs filed suit against Defendants in the District Court for Carver County, Minnesota (the “State Court Action”).  *See* Doc. No. 1-1, Compl.  In their Complaint, Plaintiffs alleged that the Agreement was a disguised, usurious loan and that Defendants were part of a RICO enterprise to collect on unlawful debt and engage in a pattern of racketeering activity.  *See id.*  Plaintiffs also alleged that the Agreement was unconscionable.  *See id.*  Plaintiffs asserted causes of action against Defendants for (1) Violation of RICO Section 1962(c), (2) Violation of RICO Section 1962(d) (Conspiracy), and (3) Declaratory Judgment.  *See id.*  On December 18, 2024, Defendants removed the State Court Action to this Court based on federal question jurisdiction.  *See* Doc. No. 1, Not. of Removal.  Defendants now move to dismiss Plaintiffs’ Complaint.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), courts consider all facts alleged in the complaint to be true and then determine whether the complaint states a “claim to relief that is

plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A pleading has facial plausibility when its factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In this analysis, courts construe the allegations and draw inferences from them in the light most favorable to the plaintiff. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018). However, courts will not give the plaintiff the benefit of unreasonable inferences, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010), and are "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986). All told, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In addition to the pleadings, courts may consider "documents whose contents are alleged in a complaint," *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (internal quotation marks omitted), and "matters…integral to the claim, items subject to judicial notice, [and] matters of public record," *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (internal quotation marks omitted). [2]

## LEGAL ARGUMENT

**I.    Plaintiffs Have Failed to State a RICO Claim Under Section 1962(c).**

To state a RICO claim, "a plaintiff must prove: (1) that the defendant violated 18 U.S.C. § 1962; (2) that the plaintiff suffered injury to business or property; and (3) that the plaintiff's injury

---

[2] Pursuant to these principles, the Court may consider the Agreement, whose contents are integral to the Complaint and referenced extensively therein, *see* Kandhorov Decl., Ex. A; the remittance history for the Agreement, which reflects the amount of My Pillow's remittances to Lifetime and whose contents are integral to Plaintiffs' claim and referenced (at least indirectly) therein, *see id.*, Ex. B; and the public records proffered by Defendants, *see* Voelbel Decl., Exs. 1-8.

was proximately caused by the defendant's RICO violation." *Fogie v. THORN Americas, Inc.*, 190

F.3d 889, 894 (8th Cir. 1999). Section 1962(c) of RICO provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Thus, a violation of Section 1962(c) requires a plaintiff to show (1) conduct

(2) of an enterprise (3) through a pattern of racketeering activity or collection of unlawful debt.

*See id.*; *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

### A. Plaintiffs Have Failed to State a RICO Claim Predicated on Collection of Unlawful Debt.

The RICO statute defines "unlawful debt" as:

> [A] debt…which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and [] which was incurred in connection with…the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). To establish a RICO violation for collection of unlawful debt, therefore, a

plaintiff must "show (1) that the debt was unenforceable under state or federal usury laws; (2) that

the debt carried twice the enforceable interest rate; and (3) that the debt was incurred in connection

with the defendants' business of lending money at a usurious rate." *Weisel v. Pischel*, 197 F.R.D.

231, 241 (E.D.N.Y. 2000).

To determine whether "the debt was unenforceable under state or federal usury laws," one

must first determine the applicable law. "[T]he general policy of the federal courts deciding federal

question cases involving choice-of-law is to apply the approach outlined by the Restatement

(Second) of Conflict of Laws [the "Restatement"]." *Kansas City Chiefs Football Club, Inc. v.

Allen*, 2013 WL 1339820, at *5 (W.D. Mo. Mar. 30, 2013); *see also Am. Home Assur. Co. v. L &

*L Marine Serv., Inc.*, 153 F.3d 616, 618 (8th Cir. 1998) (applying the Restatement to determine a choice of law issue in an admiralty case). Under Section 187 of the Restatement, "the law of the state chosen by the parties to govern their contractual rights and duties" generally applies.[3] If, however, the parties' chosen law doesn't apply, the applicable law should be determined by assessing the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See* Restatement § 188(2).

Here, the Agreement contains a Connecticut choice of law provision and, therefore, Connecticut law should apply. *See* Kandhorov Decl., Ex. A § XX.i.

If, however, Connecticut law doesn't apply, Minnesota law should apply. That's because, accepting Plaintiffs' allegations as true, Minnesota was the place of contracting, Doc. No. 1-1,

---

[3] Section 187 of the Restatement provides as follows:

   (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

   (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

      (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

      (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

   (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Compl. ¶¶ 24, 26 (alleging that Lindell executed the Agreement and Guarany in Minnesota); Minnesota was where the Agreement was negotiated, *id.* ¶ 30 ("Lifetime[]…communicated with Lindell in Minnesota…when entering into the transaction"); Minnesota was the place of performance (*i.e.*, the place from which My Pillow remitted its receipts) and the location of the subject matter of the agreement (*i.e.*, My Pillow's receipts), *see id.* ¶ 1; and Minnesota is the place of incorporation and place of business of My Pillow, *id.*  In addition, according to Plaintiffs, the alleged wrongful conduct "was purposefully aimed at" Minnesota and "the bulk of the resulting injury [was] felt by Plaintiffs in…Minnesota." *Id.* ¶ 23.  As

Notwithstanding the foregoing, Plaintiffs allege for some reason that "the applicable state usury law" is New York. *Id.* at p. 3; *see also id.* ¶¶ 46, 64, 74, 95.  Ultimately, however, it doesn't matter whether Connecticut, Minnesota, or New York law applies.  That's because, under any of these states' law, the Agreement isn't usurious and, therefore, Plaintiffs can't state a RICO claim predicated on collection of unlawful debt.

### 1.  Plaintiffs Can't Establish Usury Under Connecticut Law.

The Agreement isn't usurious under Connecticut law because (a) it's not a loan subject to Connecticut's usury laws, and (b) even if it were, it would be exempt from those laws.

### a.  The Agreement Isn't a Loan Subject to Connecticut's Usury Laws.

"[T]o constitute usury there must be a loan of money, or a forbearance of an existing indebtedness, and if no such loan or forbearance is shown, there is nothing upon which to predicate a charge of usury." *Mountain View Condo. Ass'n of Vernon, Conn., Inc. v. Rumford Assocs., IV*, 1997 WL 120254, at *3 (Conn. Super. Ct. Mar. 4, 1997) (citing 45 Am.Jur.2d, Interest and Usury § 117).  A loan is "a contract whereby in substance one party transfers to the other a sum of money which that other agrees to repay absolutely together with such additional sums as may be agreed

upon for its use." *Bridgeport L.A.W. Corp. v. Levy*, 110 Conn. 255 (1929) (internal quotation marks omitted). "Connecticut's courts have never expanded the usury statute to include any transaction which was not a loan of money." *Sci. Prods. v. Cyto Med. Lab'y, Inc.*, 457 F. Supp. 1373, 1377 (D. Conn. 1978). "[A] real sale, without any intent to loan, though it may be oppressive, cannot be usurious." *Lloyd v. Keach*, 2 Conn. 175, 178 (1817).

### i. Connecticut Looks to New York Law in Assessing Whether Revenue Purchase Agreements are Loans.

Connecticut hasn't developed a body of law to determine whether revenue purchase agreements are bona fide purchases (which aren't subject to usury laws) or loans (which are). *See Flash Funding, LLC v. Horizons Connection Services, LLC*, Docket No. HHDCV236166130S (Conn. Super. Ct. 2024) ("[T]he defendant could not point to a single Connecticut case supporting th[e] contention" that revenue purchase agreements are loans).[4] Instead, Connecticut courts have looked to New York law. *See id.* (applying New York law to determine that a revenue purchase agreement wasn't a loan); *AKF, Inc. v. Upcountry Servs. of Sharon, Inc.*, 2020 WL 1172156, at *3 (Conn. Super. Ct. 2020) ("[T]here is [New York] appellate authority on point finding that [revenue purchase] agreements…are proper finance agreements in New York that do not violate usury laws")

The great weight of authority in New York, including Appellate Division decisions, has held that revenue-based financing transactions aren't loans. *See Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*, 219 A.D.3d 1126 (N.Y. App. Div. 2023); *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752 (N.Y. App. Div. 2022); *Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*, 69 N.Y.S.3d 798 (N.Y. App. Div. 2018). These Appellate Division decisions are

---

[4] A copy of the *Flash Funding* decision is attached as Exhibit 7 to the Voelbel Declaration.

consistent with dozens of lower court and federal court rulings.  *See Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022) ("[T]he Court joins an ever-growing group of courts that have held that nearly identical agreements…[are] not [] usurious loan[s]").

The ultimate question is "whether repayment is absolute or contingent." *Principis Cap.*, 201 A.D.3d at 754.  In assessing this question, courts weigh three factors: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.  *Id*.  As to the first factor, a reconciliation provision allows the merchant to seek an adjustment of the amounts being debited from its account based on its cash flow (or lack thereof); if the merchant is doing poorly, it will pay less (and vice versa).  *See K9 Bytes, Inc. v. Arch Cap. Funding, LLC*,  57 N.Y.S.3d 625, 632 (Sup. Ct. 2017).  As to the second factor, revenue purchase agreements generally have an indefinite term because "every time [the merchant's] receipts change the amount of time it will take for [the funder] to be reimbursed will change" and, therefore, "there is no fixed end date by which [the funder] must be paid."  *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019).  Finally, as to the third factor, where bankruptcy isn't an event of default, repayment is less likely to be absolute and the transaction is less likely to be a loan.  *See, e.g.*, *Principis*, 201 A.D.3d at 754 (rejecting defendants' usury defense where "no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default").

### ii.    The Agreement Satisfies the Three Factor Test.

Here, the Agreement satisfies each of these factors.  It has a mandatory reconciliation provision providing for the adjustment of My Pillow's daily remittance if My Pillow "shall

experience unforeseen decreases to [its] Daily Receipts." *See* Kandhorov Decl., Ex. A § X.  It also

states on its face that it "does not have a fixed duration" and that "[t]he period of time that it will

take [Lifetime] to collect the Purchased Amount [of receipts]…is unknown to both Parties…and

will depend on the success of the [My Pillow's] business." *Id*., Ex. A §§ II, XIII.c.  Indeed, the

Agreement necessarily has a fixed term because, under the reconciliation provision, My Pillow's

daily remittance was subject to regular adjustment.  *See US Info. Grp. LLC v. EBF Holdings, LLC*,

2023 WL 6198803, at *8 (S.D.N.Y. Sept. 22, 2023) ("[A]n enforceable reconciliation provision,

pursuant to which payment is to be adjusted according to the seller's actual receipts, is generally

inconsistent with classification as a loan").  Finally, the Agreement doesn't make My Pillow's

filing for bankruptcy an event of default.  *See* Kandhorov Decl., Ex. A § XIX.  To the contrary, it

provides that My Pillow's filing for bankruptcy is ***not*** an event of default.  *See id*., Ex. A § XIII.i.

Pursuant to the foregoing – and as a matter of law – the Agreement isn't a loan subject to usury

laws.

### iii.    A Similar Form of Agreement Was Determined Not to be a Loan.

To the extent there could be any doubt, U.S. District Court Judge Lewis Liman (Southern

District of New York) recently determined, as a matter of law, that a similar form of agreement

was a purchase of receivables, not a loan subject to usury laws.  *See Lateral Recovery, LLC v. Cap.

Merch. Servs., LLC*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022).  In *Lateral*, the plaintiffs asserted RICO

claims predicated on collection of unlawful debt against several revenue-based financing

companies.  632 F. Supp. 3d at 402.  In reliance on the same allegations that Plaintiffs make in this

case, the *Lateral* plaintiffs argued that the parties' agreements were not bona fide purchases but

disguised, usurious loans.  *See id*. at 416-19.  The defendants moved to dismiss, arguing, among

other things, that the agreements were not loans and, therefore, the plaintiffs could not state a RICO

claim predicated on collection of unlawful debt. *See id*. at 451. In addressing the defendants'

argument, the court analyzed three different forms of agreements (which it termed Form One, Two,

and Three agreements). *See id*. The court "considered each relevant agreement in its totality and

judging it by its real character. " *Id*. at 454 (cleaned up). It "concluded that…the Form Three

agreements are not loans…." *Id*.

In reaching this conclusion, the court found the following to be dispositive:

The Form Three agreement[] expressly contemplate[s] circumstances in which the
merchant is forced to go out of business and thus is [] unable to generate and
continue to collective receivables. The agreement[] provide[s]:

> [I]f the full Purchased Amount is not remitted because Seller's
> business went bankrupt or otherwise ceased operations in the
> ordinary course of business (but not due to Seller's willful or
> negligent mishandling of its business or due to Seller's failure to
> comply with its obligations under this Agreement), Seller would not
> be in breach of or in default under this Agreement.

The agreement to remit the fixed daily amount is qualified by the provision that the
amounts must be paid on a timely basis regardless "of any reason *whatsoever other
than as the result of the Seller's business ceasing its operations exclusively due to
any of the Valid Excuses*." It defines as a Valid Excuse that "Seller shall be excused
from performing its obligations under this Agreement in the event Seller's business
ceases its operations exclusively due to the following reasons...adverse business
conditions that occurred for reasons outside Seller's control and not due to Seller's
willful or negligence mishandling of its business; [and/or] bankruptcy of Seller."

Viewed in this context and in light of the agreement as a whole, the reconciliation
provision in the Form Three agreements take on an entirely different color than in
the other agreements. They no longer offer the false comfort that if the merchant
is required to continue in a business confronted with unforeseen adverse business
conditions, lest its failure to do so accelerate its obligations under the funding, the
merchant can pass the risk of those unforeseen adverse business conditions back to
the funder through reconciliation. Rather, the reconciliation provisions in the Form
Three agreements assume that there is no unforeseen adverse business development
outside the control of the merchant that would cause the merchant to cease business;
the agreements provide that in that circumstance—the circumstance in which the
business is able to continue to operate—the merchant may use the reconciliation
provision to align the amount that the merchant has paid with what, during the prior
month, it has received. If the merchant ceases business, use of the reconciliation
provision is not necessary because the obligations do not apply. The fixed time

period in which the reconciliation may be requested is not in the Form Three agreements a sham that creates the illusion of an opportunity for the return of funds that will never be exercised. It instead reflects the necessary fact that a reconciliation may be made only after the end of the time period during which the receipts are obtained and the payments are made that are to be reconciled.

*Id*. at 459-460 (italics in original). The court concluded that "the funder takes on [the] risk in the Form Three agreements" that "[i]f, as a result of unforeseen circumstances, the merchant is no longer able to generate and collect receivables, the funder will lose." *Id*. at 460. As such, it held that "[t]he Form Three agreements…are agreements for the purchase of receivables when viewed in their totality." *Id*. at 458.

Here, the Agreement – which is substantially similar to the Form Three agreement[5] – is also a bona fide purchase (not a loan). Critically, the Agreement has provisions nearly identical to those that the *Lateral* court found dispositive:

- The Agreement provides that "[My Pillow] may not be in breach or in default of this Agreement in the event the full Purchased Amount is not remitted because [My Pillow's] business went bankrupt or otherwise ceased operations in the ordinary course of business" unless "[My Pillow's] business goes bankrupt or ceases operations due to the [My Pillow's] willful or negligent mishandling of its business or [My Pillow] purposefully failing to comply with the obligations or this Agreement." Kandhorov Decl., Ex. A § XIII.f.

- My Pillow's obligation to pay the sums due was qualified by the provision that such sums must be paid regardless of "any reason whatsoever other than as the result of the [My Pillow] business ceasing its operations exclusively due to any of the Valid Excuses." *Id*., Ex. A § IX.a.ii.

- The Agreement defines as a Valid Excuse that "[My Pillow] may be excused from performing its obligations under this Agreement in the event [My Pillow's] business ceases its operations exclusively due to…[a]dverse business conditions that occurred for reasons outside of [My Pillow's] control and are not due to [My Pillow's] willful or negligent mishandling of its business…[or] [My Pillow's] bankruptcy…." *Id*., Ex. A § XIII.i.

---

[5] The Form Three agreement from *Lateral* is attached as Exhibit 8 to the Voelbel Declaration.

Thus, just like the funder in *Lateral*, Lifetime takes on the risk in the Agreement that, if as a result of unforeseen circumstances, My Pillow is no longer able to generate and collect receivables (which, to be clear, isn't what happened here), Lifetime will lose its investment. As a result, just like the Form Three agreement, the Agreement isn't a loan and Plaintiffs' RICO claim predicated on collection of unlawful debt fails.

### b. Even if Were a Loan, the Agreement Would be Exempt from Connecticut's Usury Laws.

Connecticut's usury statute provides that "[n]o person…shall…loan money to any person and…receive [] interest at a rate greater than twelve per cent per annum." Conn. Gen. Stat. Ann. § 37-4. Certain loans, however, are exempt from the usury statute. *See id.* § 37-9; *Williams v. Cohen*, 2017 WL 2539411, at *5 (Conn. Super. Ct. May 16, 2017) ("C.G.S. § 37–9 exempts from the usury statue certain transactions"). This includes:

> [A]ny loan [1] made to a foreign…corporation, [2] organized for a profit…[3] provided such corporation…is engaged primarily in commercial, manufacturing, industrial or nonconsumer pursuits and [4] provided further that the funds received by such corporation…are utilized in such entity's business…activities and are not utilized for consumer purposes and [5] provided further that the original indebtedness to be repaid is in excess of two hundred fifty thousand dollars….

Conn. Gen. Stat. Ann. § 37-9(4)(B).

Here, even assuming, arguendo, that the Agreement were a loan (it's not), it was made to My Pillow, which is a foreign (*i.e.*, not Connecticut) corporation organized for profit that's engaged primarily in commercial, manufacturing, industrial, or nonconsumer pursuits. *See* Doc. No. 1-1, Compl. ¶ 1; Voelbel Decl., Ex. 6. The funds were to be used in My Pillow's business and not for consumer purposes; to the extent there could be any doubt, My Pillow warranted and represented to Lifetime that it was "entering into th[e] Agreement solely for business purposes and not as a consumer for personal, family or household purposes." Kandhorov Decl., Ex. A § XVII.n.

Pursuant to the foregoing, the Agreement, even if it were a loan, would be exempt from Connecticut's usury laws and Plaintiffs' RICO claim fails.

### 2. Plaintiffs Can't Establish Usury Under Minnesota Law.

The Agreement isn't usurious under Minnesota law because (a) it's not a loan subject to Minnesota's usury laws, and (b) even if it were, Plaintiffs are barred from asserting usury.

### a. The Agreement Isn't a Loan Subject to Minnesota's Usury Laws.

Under Minnesota law, usury requires, among other things, "a loan of money or forbearance of debt" and "an agreement between the parties that the principal shall be repayable absolutely." *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 299 (Minn. 2023). "[T]he element of absolute payment means that the payment of the principal cannot be contingent on any event that must occur before payment is required." *Id*. at 300. "Usury cannot be predicated on something occurring which may never occur." *Id*. Thus, for instance, in *Maslowski* the court held that a litigation financing agreement wasn't subject to usury because repayment was contingent upon the plaintiff's success in litigation. *Id*.

Just as in New York, therefore, the ultimate question in Minnesota is whether repayment is absolute (a loan) or contingent (not a loan). As such, the New York analysis in Point I.A.1.(i)-(iii), *supra*, applies. Under that analysis, repayment isn't absolute; instead, as in *Maslowski*, repayment is contingent and, thus, the Agreement can't be a usurious loan.

### b. Even if the Agreement Were a Loan, Plaintiffs Are Barred From Asserting Usury Under Minnesota Law.

"[U]nder Minnesota law, corporations are statutorily barred from taking advantage of usury laws." *Farnam St. Fin., Inc. v. Balaton Grp., Inc.*, 2011 WL 1258512, at *6 (D. Minn. Mar. 30, 2011); *see also Velocity Express Corp. v. Bayview Cap. Partners, LP*, 2002 WL 980502, at *5 (D.

Minn. May 9, 2002) ("Minnesota law does not set a ceiling for interest rates that can be charged to a corporation").[6]  This prohibition is codified in Minn. Stat. § 334.022, which provides as follows:

> Notwithstanding any law to the contrary, no limitation on the rate or amount of interest, points, finance charges, fees, or other charges applies to an extension of credit to an organization, and any such extension of credit is exempt from the other provisions of this chapter.  "Organization" means a corporation, government, government subdivision or agency, trust, estate, partnership, joint venture, cooperative, limited liability company, or association.

Minn. Stat. § 334.022.  The rationale behind this prohibition is that "[t]he usury laws are intended to protect the weak and necessitous from being taken advantage of by lenders who can unilaterally establish the terms of the loan transaction" and "[c]orporations are presumed to have an equal bargaining position…."  *Trapp v. Hancuh*, 530 N.W.2d 879, 884 (Minn. Ct. App. 1995).

Here, My Pillow is a corporation, *see* Doc. No. 1-1, Compl. ¶ 1, is barred from asserting usury, and can't state a claim for collection of unlawful debt.  The case of *Haymount Urgent Care PC v. GoFund Advance, LLC*, 690 F. Supp. 3d 167 (S.D.N.Y. 2023), is analogous.  In that case, the plaintiffs alleged that the parties' revenue purchase agreements were disguised, usurious loans and, based on that allegation, asserted a RICO claim predicated on collection of unlawful debt.  *See id*.  The court dismissed this claim on the grounds that, under the law of the plaintiffs' home state (North Carolina), the agreements would be exempt from the usury laws even if they were loans.  *Id*. at 176 ("Under North Carolina law, the transactions…would not be considered unlawful even if they are loans" because "North Carolina's usury statute does not apply to loans greater than $25,000").  In this case, just as in *Haymount,* the Agreement, even if it were a loan, can't be

---

[6] "[I]ndividuals who guarantee a corporate debt [also] may not interpose the defense [of usury]."  *Charmoll Fashions, Inc. v. Otto*, 311 Minn. 213, 216 (1976).

usurious under the law of My Pillow's home state (Minnesota) and, therefore, Plaintiffs' RICO claim predicated on collection of unlawful debt fails.

### 3.  Plaintiffs Can't Establish Usury Under New York Law.

Just like Connecticut and Minnesota, New York provides that "[i]f [a] transaction is not a loan, there can be no usury…." *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992). As set forth in Point I.A.1.(i)-(iii), *supra*, the Agreement isn't a loan and, therefore, can't be usurious under New York law.

***

Pursuant to the foregoing, Plaintiffs can't establish the usury element of their RICO claim predicated on collection of unlawful debt under either Connecticut or Minnesota law; nor can they establish that element under New York law (the law that, for some reason, they designated in their Complaint).  Respectfully, Plaintiffs' RICO claim predicated on collection of unlawful debt fails as a matter of law and should be dismissed.

### B.  Plaintiffs Can't Establish a RICO Claim Predicated on a Pattern of Racketeering Activity.

"A pattern [of racketeering activity] is shown through two or more related acts of racketeering activity that amount to or pose a threat of continued criminal activity." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (internal quotation marks omitted). "Racketeering…includes conduct which is indictable as wire fraud." *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1053 (8th Cir. 2024) (cleaned up).  "When pled as [a] RICO predicate act[], [] wire fraud require[s] a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the [] wires will be used, and (4) actual use of the [] wires to further the scheme." *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999).  "[W]ire communications are insufficient to establish the [RICO] continuity factor unless they contain

misrepresentations themselves." *UMB Bank*, 89 F.4th at 1053 (internal quotation marks omitted). Plaintiffs asserting a pattern of racketeering claim based on the predicate act of wire fraud must plead with particularity pursuant to Rule 9(b). *See Nitro*, 565 F.3d at 428. A plaintiff, therefore, must identify the "who, what, where, when, and how" of the alleged fraud, *United States ex rel. Costner v. URS Consultants, Inc*., 317 F.3d 883, 888 (8th Cir. 2003), and "such matters as the time, place and contents of false representations, as well as the identity of the persons making the misrepresentation and what was obtained or given up thereby," *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).

In the instant case, Plaintiffs allege that the "Enterprise's misconduct [] constitutes fraud by wire." Doc. No. 1-1, Compl. ¶ 99. Plaintiffs, however, don't specify what this "misconduct" is. *See id*. They certainly don't allege the "who, what, where, when, and how" of any alleged fraud. *See id*. Nor do they identify any wire communications that allegedly contained misrepresentations. *See id*. While Plaintiffs allege that the "nature of the transaction was misrepresented" because the Agreement was supposedly a disguised usurious loan, *see* Doc. No. 1-1, Compl. at p. 4, the Agreement wasn't a loan and, even if it were, it couldn't have been usurious, *see* Point I.A.1-3, *supra*. Plaintiffs allege that there was a "bait and switch" because they were promised an additional agreement if they entered into the Agreement at issue. *See* Doc. No. 1-1, Compl. at p. 4. Plaintiffs, however, expressly warranted that the Agreement was "the entire agreement between the Parties," Kandhorov Decl., Ex. A § XX.m, and, in any event, the alleged "bait and switch" was an isolated event and, therefore, can't constitute a pattern of racketeering activity. Finally, throughout the Complaint, Plaintiffs impermissibly lump all Defendants together without saying who did what to whom, which is insufficient to state a claim in general and certainly insufficient to meet the heightened pleading standards of a RICO claim predicated on wire fraud.

*See Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief….")  Respectfully, Plaintiffs' pattern of racketeering claim fails as a matter of law.

### C.  Plaintiffs Can't Establish an Injury to Their Business or Property.

Irrespective of whether Plaintiffs can establish the predicates for collection of unlawful debt and a pattern of racketeering (they can't), their RICO claim fails because they can't establish an injury to their business or property.  A RICO plaintiff "can only recover to the extent that[] he has been injured in his business or property by the conduct constituting the violation."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  "[A] showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest."  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).  "[D]amages as compensation under RICO § 1964(c) for injury to property must, under the familiar rule of law, place appellants in the same position they would have been in but for the illegal conduct."  *Com. Union Assurance Co. v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994).  Accordingly, a plaintiff who has gained on a transaction can't claim injury under RICO.  *See, e.g.*, *Aliperio v. Bank of Am., N.A.*, 764 F. App'x 236, 239 (3d Cir. 2019) (mortgagees who gained equity in their homes due to payments had no "actual monetary loss or 'out-of-pocket loss'" to "satisfy the injury requirement of § 1964(c)").[7]

---

[7] *See also, e.g., Comm. Union*, 17 F.3d at 612 (plaintiffs claiming fraud in sale, but who paid less for the asset at issue than its value, had no RICO claim); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165 (2d Cir. 1993) (plaintiff lacked an injury to its business or property because it was likely to obtain the full value of the asset it purchased); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 138 (D.D.C. 2018) (plaintiff who did not repay a loan lacked RICO standing); *Anderson v. Lincoln Ins. Agency Inc.*, 2003 WL 291928, at *3 (N.D. Ill. Feb. 10, 2003) (plaintiffs that received payments from defendants in excess of allegedly unlawful finance charges "cannot allege any out-of-pocket or other concrete financial loss and, thus, have no standing under RICO").

Applying these principles, the court in *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022), addressed the proper measure of damages in a RICO case predicated on collection of unlawful debt. The court rejected the plaintiff's argument that its damages were "the full $119,617 that was deducted from [its] account" because "[t]he purpose of a civil RICO award is to return the plaintiff to the same financial position he would have enjoyed absent the illegal conduct." *Id*. The Court instead held that the plaintiff's damages were "the sum that was debited from its account less the sum it received and was able to enjoy." *Id*. at *6.

Here, the sum that was debited from My Pillow's account was $268,800. Kandhorov Decl., Ex. B. The sum that My Pillow received and was able to enjoy, however, was $563,965. *See* Doc. No. 1, Compl. ¶ 64. My Pillow, therefore, ***gained*** $295,965 on the parties' transaction. *See id*.; Kandhorov Decl., Ex. B. It hasn't suffered a "concrete financial loss"; to the contrary, it has enjoyed a windfall gain. As such, My Pillow can't establish an injury to its business or property and, for this additional reason, its RICO claim fails.

## II.    Plaintiffs Have Failed to State a RICO Conspiracy Claim Under Section 1962(d).

Section 1962(d) prohibits individuals from conspiring to violate RICO. *See* 18 USC § 1962(d). "To successfully allege conspiracy to violate RICO...[a plaintiff] must first prove the elements of a RICO violation." *UMB Bank*, 89 F.4th at 1057. Here, as set forth above, Plaintiffs have failed to do so and, therefore, their RICO conspiracy claim fails.

## III.    Plaintiffs Have Failed to State a Declaratory Judgment Claim.

Plaintiffs' declaratory judgment claim fails because the Agreement was neither a usurious loan nor unconscionable.

**A. Plaintiffs' Can't Obtain a Declaratory Judgment That the Agreement is a Usurious Loan.**

Plaintiffs seek a declaratory judgment that the Agreement is "a usurious loan in violation of the applicable state usury laws" and, thus, "void and unenforceable." Doc. No. 1-1, Compl. ¶ 143. As noted, however, under Connecticut and Minnesota law the Agreement isn't a loan and, even if it were, the usury laws wouldn't apply, *See* Point I.A.1-2, *supra*. Under New York law, the Agreement isn't a loan, *see* Point I.A.3, *supra*, and, even if it were, corporate entities and their guarantors can't obtain affirmative relief (like a declaratory judgment) based on alleged usury. *See, e.g., Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *3 (S.D.N.Y. Sept. 20, 2022) ("Plaintiffs are barred from bringing affirmative claims for relief based on allegations of usury"). Plaintiffs' declaratory judgment claim fails.

**B. Plaintiffs Can't Obtain a Declaratory Judgment That the Agreement is Unconscionable.**

Plaintiffs also seek a declaratory judgment that the Agreement is unconscionable. Doc. No. 1-1, Compl. ¶ 142.[8] "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other...." *Beyor v. Beyor*, 158 Conn. App. 752, 758 (2015); *see also Matter of Est. of Hoffbeck*, 415 N.W.2d 447, 449 (Minn. Ct. App. 1987); *King v. Fox*, 7 N.Y.3d 181, 191 (2006). "The doctrine of unconscionability…generally requires a showing that the contract was both procedurally and substantively unconscionable…." *Hirsch v. Woermer*, 184 Conn. App. 583, 589 (2018); *see also Butler v. ATS Inc.*, 2021 WL 1382378, at *19 (D. Minn. Apr.

---

[8] To the extent New York law applies, this claim fails because "unconscionability is an affirmative defense to the enforcement of a contract," *Ng v. HSBC Mortg. Corp.*, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011), and "does not give rise to a cause of action." *Galvin v. First Nat. Monetary Corp.*, 624 F. Supp. 154, 158 (E.D.N.Y. 1985).

13, 2021); *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983). Procedural unconscionability generally means an "absence of meaningful choice." *Emeritus Senior Living v. Lepore*, 183 Conn. App. 23, 29, (2018); *see also Mainville v. Coll. Town Pizza, Inc.*, 629 F. Supp. 3d 913, 921 (D. Minn. 2022); *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2011). "Substantive unconscionability is indicated by contract terms so one-sided as to shock the conscience…." *Homesite Ins. Co. v. Brezniak*, 581 F. Supp. 3d 424, 433 (D. Conn. 2022); *see also In re Ursula E. Nelson Tr. under Agreement dated 3/21/2014, as Amended*, 2023 WL 4418643, at *5 (Minn. Ct. App. July 10, 2023); *King*, 7 N.Y.3d at 191. "Courts do not generally find contracts unconscionable where the parties are businesspersons." *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 31 Conn. App. 455, 464 (1993); *see also Servs., Inc. v. Franz*, 534 N.W.2d 261, 269 (Minn. 1995) (finding no unconscionability "where the parties were both merchants and there was no great disparity in their bargaining strength and [] the claim [wa]s for commercial loss"); *Gillman v. Chase Manhattan Bank, N.A.*, 521 N.Y.S.2d 729, 732 (N.Y. App. Div. 1987) (noting that the doctrine of unconscionability has "little applicability in the commercial setting because it is presumed that businessmen deal at arm's length with relative equality of bargaining power").

Here, Plaintiffs' unconscionability claim fails. Lindell is a world-famous businessman who, at one time, had access to the Oval Office and the ear of the President of the United States. He and My Pillow are highly sophisticated commercial actors with extensive business experience. They are the antithesis of the "commercially illiterate consumer" that the doctrine of unconscionability was designed to protect. *See Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 523 (1976). They have no grounds to claim procedural unconscionability and, for that reason alone, their unconscionability claim fails. In any event, the Agreement isn't substantively unconscionable. Courts have repeatedly held that revenue purchase agreements are

valid and enforceable (not unconscionable contracts of adhesion), *see, e.g., Streamlined Consultants*, 2022 WL 4368114, at *5, and the terms about which Plaintiffs complain (a forum selection provision, a personally guaranty, a security agreement, a one-sided attorney's fee provision, a prohibition on further encumbrances, etc.) are unremarkable terms found in myriad commercial contracts. Plaintiffs can't establish procedural or substantive unconscionability and, as such, their declaratory judgment claim fails.

## **CONCLUSION**

Pursuant to the foregoing, Defendants respectfully submit that Plaintiffs' Complaint should be dismissed with prejudice.

Dated: January 23, 2025                                                    **FELHABER LARSON**

By:   /s/  Richard R. Voelbel
　　　Richard R. Voelbel, #0387091
　　　220 South Sixth Street, Suite 2200
　　　Minneapolis, Minnesota 55402
　　　(612) 339-6321
　　　rvoelbel@felhaber.com

　　　*Attorneys for Defendants Lifetime*
　　　*Funding, LLC, FunderZgroup, LLC,*
　　　*Michael Kandkhorov, Michael Kandhorov*
　　　*(a/k/a Michael Kand), and Abraham*
　　　*Kandhorov (a/k/a Abe Kand)*